**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellant*, | No. 18-10287 |
| | D.C. No. 2:16-cr-00046-GMN-PAL-1 |
| v. | |
| CLIVEN D. BUNDY, AKA Cliven Bundy; RYAN C. BUNDY; AMMON E. BUNDY; RYAN W. PAYNE, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted May 29, 2020
Las Vegas, Nevada

Filed August 6, 2020

Before: William A. Fletcher, Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's judgment dismissing with prejudice, due to violations of *Brady v. Maryland*, an indictment charging Cliven Bundy; two of his sons, Ryan and Ammon Bundy; and Ryan Payne with obstructing federal law enforcement officials carrying out lawful court orders.

The indictment followed a well-publicized effort by the Bureau of Land Management to impound Cliven Bundy's cattle for a twenty-year failure to pay federal grazing fees. Cliven Bundy and hundreds of armed supporters from around the United States forced federal officials to abandon the impoundment plan.

Days into the defendants' trial, the government began disclosing information in its possession that, under *Brady*, was arguably useful to the defense and should have been produced to the defendants well before trial. As additional documents came forth, the district court held a series of hearings, eventually deciding that the trial could not go forward and that the indictment must be dismissed with prejudice.

Reviewing whether the district court properly dismissed the indictment under its supervisory powers, the panel considered the evidence cited by the district court to decide

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

whether substantial prejudice resulted from the *Brady* violations, whether flagrant misconduct occurred, and whether alternative remedies could have redressed the injury here.

Central to the government's case were allegations that the defendants intentionally lied about being surrounded by snipers as a ploy to gather armed supporters. Had the defendants been able to proffer a basis for genuinely believing that government snipers surrounded the Bundy Ranch, they potentially could have negated the government's scienter theory. Surveying all of the withheld evidence – including surveillance-camera evidence, FBI "302" investigative reports regarding snipers, Tactical Operations Center (TOC) log records, and threat assessments – the panel held that the record amply supports the district court's conclusion that the defendants suffered substantial prejudice in not being able to prepare their case fully, refine their voir dire strategy, and make stronger opening statements.

Regarding the question of flagrant misconduct, the panel wrote that to the extent any government agencies or actors, through their own flagrant misconduct, failed to make known exculpatory information, the flagrant nature of such conduct will be imputed to the prosecution. The panel explained that flagrant misconduct need not be intentional; reckless disregard for the prosecution's constitutional obligations is sufficient. Although it saw only negligence in the withholding of the TOC log records, the panel found no clear error in the district court's conclusion that the withholding of the surveillance-camera evidence, the 302s, and the threat assessments crossed the threshold from negligence to recklessness. The panel observed that the prosecution withheld facially exculpatory evidence that directly negated

the government's theory that the defendants lied about fearing snipers, and that the deliberate choices to withhold those documents were not cases of simple misjudgment.

The panel wrote that although dismissal with prejudice requires a district court to find that "no lesser remedial action is available," the panel understands by this phrase that a district court must conclude that no lesser remedy will fully address the damage caused by the government's misconduct. The panel concluded that the district court, which thoroughly considered the prejudicial effects, did not abuse its discretion in dismissing the indictment with prejudice. The panel wrote that lesser sanctions would have given the government an opportunity to strengthen its case at the defendants' expense, and noted the related need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct as occurred here.

## COUNSEL

Elizabeth O. White (argued), Appellate Chief; Nicholas A. Trutanich, United States Attorney; United States Attorney's Office, Reno, Nevada; for Plaintiff-Appellant.

Larry E. Klayman (argued), Washington, D.C., for Defendant-Appellee Cliven D. Bundy.

Amy B. Cleary (argued), Cristen C. Thayer, and Ellesse Henderson, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Defendant-Appellee Ryan W. Payne.

Daniel Hill, Hill Firm, Las Vegas, Nevada, for Defendant-Appellee Ammon E. Bundy.

Alyssa D. Bell, Cohen Williams LLP, Los Angeles, California, for Defendant-Appellee Ryan C. Bundy.

## OPINION

BYBEE, Circuit Judge:

Cliven Bundy, two of his sons, Ryan and Ammon Bundy, and sixteen other persons were charged with obstructing federal law enforcement officials carrying out lawful court orders. The indictments followed a well-publicized effort by the Bureau of Land Management (BLM) to impound Cliven Bundy's cattle for a twenty-year failure to pay federal grazing fees. Bundy and hundreds of armed supporters from around the United States forced federal officials to abandon the impoundment plan. Fortunately, no one was injured in the confrontation.

Days into the Bundys' trial, the government began disclosing information in its possession that, under *Brady v. Maryland*, 373 U.S. 83 (1963), was arguably useful to the defense and should have been produced to the defendants well before trial. As additional documents came forth, the district court held a series of hearings, eventually deciding that the trial could not go forward and that the indictments must be dismissed with prejudice. Under *Brady*, "[t]he prosecution is trusted to turn over evidence to the defense because its interest 'is not that it shall win a case, but that justice shall be done.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1133–34 (9th Cir. 2014) (quoting *Strickler v. Greene*,

527 U.S. 263, 281 (1999)).  A district court is imbued with discretion in the supervision of proceedings before it and may dismiss an action when, in its judgment, "the defendant suffers substantial prejudice and where no lesser remedial action is available."  *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (citations and quotation marks omitted).  Finding no abuse of discretion, we affirm the judgment of the district court.

## I.  BACKGROUND

### A.  *Factual History*

This case stems from an infamous standoff between Cliven Bundy, his sons,[1] and groups of dedicated followers and BLM.  Bundy lives on 160 acres of land near Bunkerville, Nevada, about eighty miles northeast of Las Vegas, near the Arizona border.  It is rugged, Mojave-dry country, bounded by the Gold Butte National Monument and the Lake Mead National Recreation Area, and watered by the Virgin River—which, by any standards, is more a creek than a river.  For decades, Bundy and his family have grazed their cattle on the more than half a million acres of surrounding federal land.  Since the early 1990s, Bundy has refused to obtain permits and pay fees and fines for grazing his cattle on the federal lands surrounding his property.  Several court orders previously found that Bundy's cattle were trespassing on federal land and ordered Bundy to remove his cattle or risk having them impounded.  *See United States v. Bundy*,

---

[1] Two of Cliven Bundy's sons, Ammon and Ryan, are defendants in this proceeding.  Others figure in the facts.  For convenience we will refer to Cliven Bundy as "Bundy" and his sons by their full names, *e.g.*, "Ammon Bundy" and "Ryan Bundy."

No. 2:12-cv-0804, 2013 WL 3463610, at *1–3 (D. Nev. July 9, 2013) (authorizing the government to "seize and remove to impound any of Bundy's cattle for any future trespasses"); *see also United States v. Bundy*, 178 F.3d 1301 (9th Cir. 1999) (unpublished table decision).  Bundy ignored those orders, claiming that he had "vested grazing rights" and that the State of Nevada, not the United States, was the rightful owner of the lands.

In early 2014, BLM began putting into place a large-scale operation to impound Bundy's cattle.  The plan called for contractors from Utah to round up cattle that were trespassing on federal land.  The cattle would then be sold at auction. BLM notified Bundy of its intentions in mid-March of 2014. Bundy did not respond to the notices, but in interviews with local papers stated that he was "ready to do battle with the BLM," that he would muster family, friends, and supporters, and "do whatever we have to after that."

BLM made extensive preparations for "Operation Gold Butte Impound."  Coordinating with agents from the National Park Service and Federal Bureau of Investigation, BLM anticipated resistance from Bundy and his supporters.  It planned to escort the contractors in and out of the area each day.  BLM established a Listening Post/Observation Post (LP/OP) "strategically placed at elevated positions around the Bundy residence each evening" where agents were outfitted with binoculars, spotting scopes, night-vision goggles, and thermal-imaging devices.  The LP/OP personnel were to have "agency-issued rifles with them at all times."  BLM also established a Tactical Operations Center (TOC), Forward Operating Base (FOB), a media site, and a "free speech area."

On-site operations began the first week of April. On April 6, 2014, another of Bundy's sons, Dave Bundy, blocked a BLM convoy on a state route and was arrested. The Bundys responded by inviting private militia groups such as Operation Mutual Aid, 3 Percenters Club, Freedom and Fighters, and Oath Keepers to come to their defense. The Bundys claimed that the government was taking their cattle and holding one of the Bundys prisoner, and had snipers in position surrounding the Bundy compound. Among those who responded was defendant Ryan Payne, who was a founder of Operation Mutual Aid. Hundreds of Bundy supporters, many heavily armed, poured into the area.

On April 9, 2014, Ammon Bundy led a mob to block a BLM convoy and was tased by officers. Payne used the incident to contact additional militia groups and solicit their help. By April 11, BLM had seized approximately 400 animals. FBI agents informed BLM that the gathering militia posed a significant threat to federal officials and private contractors, and advised BLM to cease the operation. The next day, Bundy and his supporters, then estimated to be more than 200 people, assembled to reclaim Bundy's cattle. Clark County Sheriff Doug Gillespie intervened with Bundy and told the group that BLM had called off the impoundment. Bundy made additional demands, and when they were not met, told the crowd that it was time to "get those cattle." The crowd then moved to the entrance of the impoundment site, located in a dry-wash bed under an Interstate 15 bridge. Armed supporters took up threatening and tactically advantageous positions, pointing guns at BLM officers. Additional supporters arrived, some on horseback, swelling Bundy's ranks to more than 400 people. The Bundys demanded that the officers leave. Heavily outnumbered and interested in avoiding bloodshed, federal officials evacuated

the impoundment site and left the cattle for the Bundys to reclaim.

## B. *Procedural History*

### 1. The Indictment

In March 2016, a federal grand jury indicted nineteen defendants, including Bundy, his sons Ammon and Ryan, and Ryan Payne (collectively, "the defendants"), for a slate of federal crimes stemming from the standoff, including impeding federal officers, threatening federal law enforcement, and extortion, along with conspiracy to commit these crimes. The district court divided the defendants into three groups, according to their degree of involvement. Cliven Bundy, Ryan Bundy, Ammon Bundy, Ryan Payne, and another militia leader, Peter Santilli, were placed in Tier 1. The district began with a trial for the Tier 3 defendants, to be followed by Tier 1 and Tier 2.[2]

A central pillar of the government's case was the allegation that the defendants recruited armed followers by intentionally deceiving those followers into believing that the Bundys feared for their lives because government snipers surrounded their ranch. According to the indictment, once the large group of supporters had amassed, the defendants were then able to use their followers to thwart the impound operation. Specifically, ¶ 58 of the indictment alleged that

---

[2] The Tier 3 trial commenced on February 6, 2017 and resulted in conviction of two defendants; the jury hung as to the remaining defendants. On retrial, the jury acquitted two defendants on all charges and two defendants on some charges; the jury hung for a second time on the remaining charges.

the defendants "used deceit and deception to recruit gunmen and other Followers," flooding the internet with "false, deceitful, and deceptive images" for the "unlawful purpose of interfering with impoundment operations, obstructing the execution of federal court Orders and using force and violence against federal law enforcement officials." Paragraph 84 further stated that the defendants had created "false, deceitful and deceptive statements to the effect that the BLM supposedly: employed snipers against Bundy family members . . . ." As for Ryan Payne, ¶ 88 alleged that on April 7, 2014, he had posted messages to followers "stating falsely, among other things, that the Bundy Ranch was surrounded by BLM snipers, that the Bundy family was isolated, and that the BLM wanted BUNDY dead." Regarding Bundy, ¶ 92 of the indictment recounted how, on April 8, 2014, he had broadcast a statement saying, "they have my house surrounded . . . the federal government is stealing my property . . . [the BLM] are armed with assault rifles . . . they have snipers." The indictment contended that this statement was deceitful and made with "the purpose of recruiting gunmen and other Followers" to come to the Bundy Ranch and obstruct the impoundment.

2. The Motion-in-Limine Order

In preparation for trial, the defendants requested any potentially exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence that could negate the government's scienter theory. Notably, to combat the government's allegation that the defendants had lied about fearing being surrounded by snipers, the defendants sought materials showing the presence of armed officers in tactical gear taking positions around the Bundy Ranch. The defense

also wanted evidence to support their claim that the impoundment operation was over-militarized.

In October of 2017, shortly before trial began, the government obtained a favorable ruling on a motion in limine, which limited the defense's ability to introduce evidence regarding the affirmative defense of self-defense against government actors. The district court concluded that the affirmative defense was not available to the defendants because they knew the "official status" of the federal officers and there was no evidence that the officers used excessive force. However, the district court left open the possibility that the defendants could present evidence supporting the affirmative defense with "an offer of proof outside the presence of the jury that the defense should apply." In the same order, the court denied the government's request to preclude evidence regarding the defendants' state of mind. The government cited this order to justify several of its decisions to withhold evidence.

3.  Opening Statements

Trial commenced on October 30, 2017. The government's opening statements emphasized the theory that the Bundys and their co-conspirators intentionally spread misinformation about being surrounded by snipers to inflame supporters. The government recounted that following Dave Bundy's arrest on April 6, the Bundys posted messages and photos on social media:

> And the messaging that was put out by the Bundys, by the Bundys and their supporters, was that this was BLM being a large Army that was coming to attack them, was coming

> to interfere with them, was coming to abuse them. And you will hear how the messaging transformed from stealing cattle to now they've got snipers aimed at us. Now they've got our house surrounded. Now we can't move. We've got to shelter in place. We can't do anything because the BLM has got us surrounded.
>
> And that was false . . . .

The government made clear that the Bundys' purported lies about feeling surrounded by menacing snipers was key to their recruiting followers such as Ryan Payne and Peter Santilli to come to Nevada, obstruct the impound operation, and "protect against tyranny."

### 4. Hearings Regarding Withheld Evidence

As trial got underway, it became apparent that important evidence had been withheld by the government. Over the course of the following weeks, the district court held several hearings regarding this evidence as it trickled out during trial.

a. *November 7 and 8 Hearings.* On November 6 and 7, 2017, just a week into the trial, the defendants filed successive motions to dismiss for discovery misconduct. They faulted the government for failing to provide evidence regarding (1) video surveillance of the Bundy property and (2) the presence of FBI and BLM tactical units armed with AR-15 rifles. In August 2017, the defense had requested information related to a camera placed near the Bundy Ranch. The request was supported by an affidavit from Ryan Bundy, who averred that he had seen a camera device on a tripod

with a telephoto lens and a "visible laser." He said the tripod was on a hill northeast of and overlooking the Bundy house. The government, however, had opposed this request, referring to it and other requests as a "fantastical fishing expedition." Yet on November 3, the fourth day of trial, the defense learned that the FBI had in fact set up a camera on a hill northeast of the Bundy home. The camera had a live feed to BLM's command center.

The district court held a hearing on November 7 regarding the camera evidence. The court held another hearing the next day regarding newly released evidence showing the presence of heavily armed patrols near the Bundy property. The defendants emphasized that this new evidence was material because it undercut the government's ability to prove that they had intentionally lied to supporters about fearing government snipers. Specifically, the defendants argued that the presence of surveillance equipment and law-enforcement officers armed with AR-15 rifles contributed to the defendants' fear that they were surrounded.

The district court agreed with the defendants that the requested surveillance-camera evidence was material. However, it also concluded that the government had not acted in bad faith by withholding information about the camera because the court had previously thought that the information related to surveillance cameras was irrelevant and there was "no apparent or readily apparent materiality." As for the late evidence regarding heavily armed officers, the district court agreed that the information was material because it was "relevant to developing a possible defense to the allegation that false statements were provided about the existence of snipers and being isolated and surrounded." The district court

ordered the government to turn over any additional evidence related to the surveillance camera or snipers.

b. *November 13 Hearing*. During the first week of November, the government disclosed additional evidence regarding the surveillance camera and officers armed with assault rifles in full tactical gear. Two disclosures came in the form of FBI investigative reports known as "302s." The first was a 302 regarding Kevin Egbert (the Egbert 302). This 302 recorded the placement of the camera and attempts to repair it after it was damaged. The second was a 302 describing the activities of Special Agent Edward Delmolino (the Delmolino 302). This 302 described how Agent Delmolino was dressed in BLM tactical gear and took an overwatch position near the Bundy Ranch. A thumbdrive with a log of activities at the Tactical Operations Center, referred to as the "TOC Log," was produced on November 11, 2017. This log served as the FBI's record for SWAT operations during the impound operation. The Log referenced the insertion of "snipers" and recounted descriptions of the live feed from the surveillance camera.

The defense renewed its motions to dismiss and the district court held another hearing on November 13, 2017. The government represented that the prosecutors from the U.S. Attorney's Office had "been as diligent as we possibly can." The district court agreed that "everyone's doing the best they can faced with the information that we have, which is more interesting than in the usual case" and found that "there's no *Brady* violation . . . , much less a pattern of any *Brady* violations." But the court then stated that the government would need "to do more than it's already done." The defense, meanwhile, again emphasized the crucial nature of this evidence to countering the government's theory that

the defendants had purposefully "spread[] false information about the presence of militarized government operation surrounding" the Bundy home.

As for the motions to dismiss, the district court said that the defendants' arguments were "premature" because "only 24 pages [of new discovery] ha[d] been provided." But the court noted that if "more information . . . is provided and . . . creates prejudice, then the Court would certainly entertain" further motions. The court also expressed its dismay with the government that important evidence was being produced so late and, in particular, that the government had made "representations . . . that things did not exist but ultimately were found to exist." Thus, while the district court believed that the prejudice to the defense was not at that point sufficient to keep the case from proceeding, it explained that prejudice would have to be reassessed "to see whether this has put the defense . . . in an untenable position." The court warned that it might have to consider a remedy, including continuance or mistrial, with or without prejudice. "[T]here's a lot of information that's coming to light very late. And so, it's troubling to the Court." The government, however, continued to maintain that a lot of the new information produced was not material.

c. *November 29 Hearing.* As trial continued, testimony exposed even more withheld documents. During the pretrial discovery phase, the defense had requested "all the threat assessments prepared in this case." The government provided one threat assessment prepared in 2014. In its opening statement, the government had referred to a BLM decision to impound Bundy's cattle in 2012. The government represented that BLM decided not to confront Bundy "because of the concern for violence." During testimony,

however, a prosecution witness mentioned a 2012 threat assessment, and recounted how the assessment concluded that Bundy posed no threat of harm. It then came to light that other threat assessments had been withheld—several of which had been prepared for a possible impoundment action in 2012. These assessments rated Bundy as having a low-to-moderate risk of violence. The government also produced new evidence regarding surveillance of Bundy's home and the presence of armed officers. The new evidence was two Nevada Joint Terrorism Task Force reports. One report noted the presence of SWAT personnel and the presence of the camera with supporting technicians. It also detailed events leading to the FBI's placement of the camera.

The district court held another hearing about this new evidence on November 29, 2017. The court again expressed frustration with the "dribs and drabs" of new discovery being released. The court recognized that "the [U.S. Attorney's Office] has been diligent," but faulted "other government agencies; not in the U.S. Attorney's Office." But the prosecution conceded that it had had the threat assessments in its possession all along. The government explained that it did not hand the assessments over because it considered them neither exculpatory nor responsive to the defense's request for threat assessments "in this case."

The government also explained why it had been late in turning over several FBI investigative reports regarding tactical-operations teams once it became evident that the presence of "snipers" would be an integral part of the defense's strategy. And it insisted that the officers present at the site were not actually snipers. The district court, however, found this explanation "very troubling," because the court had excluded testimony at the earlier trial of the Tier 3

co-defendants regarding the presence of snipers based on the government's representation that there were no snipers at the site.  Yet, in the middle of Bundy's trial, the government was producing documents that referred to its own agents as "snipers."

d.  *December 11 Hearing*.  On December 11, 2017, the district court held a final hearing on the defendants' motions to dismiss.  The court reviewed the evidence that had been produced after the start of the trial.  It noted that there were different deadlines for the government to produce evidence to the defense, depending on whether its obligations arose under *Brady*, *Giglio*, *Jencks*, or Federal Rule of Criminal Procedure 16(a)(1)(E).  In general, however, the court found that the evidence should have been produced no later than October 1, 2017, thirty days before the start of trial.

Beginning with the surveillance-camera evidence, the district court was "concerned that there seems to [have been] some coyness on behalf of the government" in turning over that evidence.  However, the court explained that, at that time, it appeared the information was timely provided.

But the district court then stated that it was inclined to find that much of the information regarding the presence of snipers was untimely.  Even though the FBI promptly turned over several 302s prepared after the discovery deadline, the district court explained that the information contained in the 302s was nevertheless untimely.  The TOC Log "was in existence long before [November 2017]."  The court also expressed dissatisfaction with the government's explanation that it had not provided this information earlier because the government was unaware that this information would be central to the defense's theory of the case.

The district court then went through the materiality of the late threat assessments. The court explained that the March 2011 assessment information contradicted other evidence and "could be useful for impeachment purposes." It further found that the government's production of the threat assessments was likely untimely. Thus, the district court agreed to take the motions to dismiss under submission.

### 5. The District Court Declares a Mistrial

On December 20, 2017, the district court concluded that the trial could not proceed. It began by emphasizing that *Brady* requires the prosecution "to learn of material exculpatory and impeachment evidence in the possession of other agencies." Where there is doubt about the usefulness of evidence to the defense, the government should "resolve such doubts in favor of full disclosure." The court reviewed each piece of evidence—evidence regarding the surveillance camera, snipers, and threat assessments—contained in newly provided FBI 302s, the TOC Log, the prior threat assessments, and other documents. The court found that the government had failed to timely disclose most of the evidence at issue, and that the failure was "willful" on the government's part and prejudiced the defense.

As for possible remedies, the district court found that recalling witnesses or granting a continuance to allow the defendants time to review the new evidence would be insufficient. The parties had already impaneled a jury and made opening statements. The court believed that the withheld evidence had deprived the defendants of the opportunity to better tailor their voir-dire strategy and make stronger opening statements. Thus, the court concluded that mistrial was necessary. The court stopped short of dismissing

the case, instead asking for briefing on whether "mistrial should be with or without prejudice."

### 6. The Decision to Dismiss the Indictment with Prejudice

On January 8, 2018, after permitting written briefing, the district court concluded that the *Brady* violations were so egregious and prejudicial that the indictment needed to be dismissed with prejudice.  It found "that retrying the case would only advantage the government by allowing [it] to strengthen [its] witnesses' testimony based on the knowledge gained from the information provided by the defense and revealed thus far."  The court also highlighted "the prosecution's failure to look beyond the FBI file that was provided" for additional relevant information constituted a "reckless disregard for its [constitutional] obligations to learn and seek out favorable evidence."  The court characterized the government's "representations about whether individuals were technically 'snipers' or not 'snipers' [as] disingenuous" given that the FBI's own documents referred to government "snipers" in the operation.  It concluded that the FBI's failure to produce these documents was "flagrant prosecutorial misconduct in this case even if the documents themselves were not intentionally withheld [by the U.S. Attorney's Office] from the defense."  Thus, it decided that no lesser sanction was available because the government's "conduct has caused the integrity of a future trial and any resulting conviction to be even more questionable."  Retrial "would only advantage the government."  The court dismissed the indictment with prejudice as a remedy for a due process violation and under its supervisory powers.

The government moved for reconsideration.  First, the government argued that the court had mistakenly found the evidence "material" because there was no legally cognizable way for the defendants to assert the affirmative defenses of provocation or self-defense against a law officer.  The government pointed to the district court's grant of its motion in limine, which determined that evidence related to the affirmative defenses was irrelevant.

The district court was unmoved.  It highlighted how the motion-in-limine order had specifically left open the possibility that the defendants could raise an affirmative defense if they could make an offer of proof to support a theory of provocation or self-defense.  The court said that its order "placed the Government on notice that evidence that could bolster a theory of self-defense might become relevant at trial."  Hence, the court stated that its order did not excuse the government from turning over evidence helpful to the defense.  The court again chastised the government for claiming ignorance that the defendants would need evidence about the cameras or snipers because a central part of the government's case was that the defendants knowingly spread false statements that snipers were surrounding the Bundy Ranch.

Second, the government asserted that the court had failed to consider less drastic remedies.  In response, the court pointed to its discussion in the record that lesser sanctions could not cure the prejudice.  And it said that any lack of consideration for a specific remedy was the fault of the government, because it failed to raise possible alternative sanctions.  Thus, the district court denied the government's motion for reconsideration.  The government now appeals.

## II.  STANDARD OF REVIEW

We review the district court's dismissal of an indictment under its supervisory powers for an abuse of discretion. *Chapman*, 524 F.3d at 1086.  Any legal issues predicating the district court's dismissal receive de novo review.  *United States v. Velarde-Gavarrete*, 975 F.2d 672, 674 (9th Cir. 1992).  However, the "district court's findings of fact are reviewed for clear error."  *Id.*

## III.  DISCUSSION

The question presented in this case is whether the government's actions were sufficiently egregious to merit dismissal with prejudice.  A district court may dismiss an indictment for government misconduct for one of two reasons, each with its own standard: either because it finds a serious due-process violation or because it concludes that dismissal is warranted under its supervisory powers. *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993).  Dismissal for a due-process violation requires the government's conduct to "be so grossly shocking and outrageous as to violate the universal sense of justice."  *Id.* "The [due process argument] is usually raised in situations where law enforcement conduct involves extreme physical or mental brutality or where the crime is 'manufactured by the government from whole cloth.'"  *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992) (citation omitted).

A district court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and

(3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983) (internal citations and quotation marks omitted)). The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from "making . . . themselves accomplices in willful disobedience of law." *McNabb v. United States*, 318 U.S. 332, 345 (1943). A district court can dismiss an indictment under its supervisory powers even if "the conduct does not rise to the level of a due process violation." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). Because it is unnecessary to decide if both standards are met here, we will only review whether the district court properly dismissed the indictment under its supervisory powers. *See Chapman*, 524 F.3d at 1084 n.5 ("Because the district court did not abuse its discretion in dismissing the indictment under its supervisory powers, we need not consider whether the dismissal was also justified by the government's violation of Defendants' due process rights.").

When considering an exercise of its supervisory powers, a district court has various options. The court may limit the witnesses or testimony offered by the government, or it may sanction the attorneys. *See Hasting*, 461 U.S. at 506 & n.5. The court may dismiss the case without prejudice, which requires dismissing the jury and forces the government to begin anew. The most drastic remedy is dismissal with prejudice, because this prevents the government from retrying the defendants at all. *See Chapman*, 524 F.3d at 1085 (explaining that improper dismissal of "an indictment with prejudice encroaches on the prosecutor's charging authority" (internal quotation marks omitted)); *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("Dismissal of an

indictment with prejudice necessarily implicates separation-of-powers principles. . . . Such dismissal exercised under the guise of 'supervisory power' is impermissible absent 'a clear basis in fact and law for doing so.'"). Under its supervisory powers, a district court may dismiss an indictment with prejudice for prosecutorial misconduct only if there is "(1) flagrant misbehavior and (2) substantial prejudice." *Kearns*, 5 F.3d at 1253. Further, the district court must "approach [the remedy] with some caution and a with a view toward balancing the interests involved," *Hasting*, 461 U.S. at 506–07 (citations and quotation marks omitted), and have concluded that there is "no lesser remedial action" available to it. *Chapman*, 524 F.3d at 1087 (citations omitted).

The district court concluded that dismissal with prejudice was appropriate because the government withheld key evidence favorable to the defense until after trial was underway—in clear violation of its duties under *Brady*—and dismissing without prejudice would allow the government to cure its mistakes, to the detriment of the defendants. It is, of course, beyond dispute that under *Brady* a defendant is entitled to evidence "both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674 (1985) (quoting *Brady*, 373 U.S. at 87). "*Brady* evidence" can be favorable "either because it is exculpatory or impeaching." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). For a *Brady* violation to occur, "the government must have willfully or inadvertently failed to produce the evidence" and "the suppression must have prejudiced the defendant." *Id.* But simply showing a *Brady* violation—withholding of evidence that caused prejudice—is not a sufficient basis to dismiss an indictment. Only where the government withheld *Brady* material through "flagrant misconduct," causing "substantial prejudice" to the accused,

will justify the court's exercise of its supervisory powers to dismiss the case with prejudice. *Kearns*, 5 F.3d at 1253.

Determining whether these prerequisites for dismissal were satisfied here requires us to review the evidence in question and the circumstances of its withholding. We begin with a review of the evidence to decide whether substantial prejudice resulted, keeping in mind that not everything that the government turned over to the defense after the trial began was important to the defense. Nor did the district court rely on all the evidence produced. Accordingly, our review is confined to evidence cited by the district court. We then turn to whether flagrant misconduct occurred. Finally, we examine whether alternative remedies could have redressed the injury here.

A. *Whether the Withheld Evidence Substantially Prejudiced the Defense*

Central to the government's case against the defendants were the allegations in ¶¶ 58, 84, 88 and 92 of the indictment that the defendants intentionally lied about being surrounded by snipers as a ploy to gather armed supporters. The indictment alleged that the Bundy defendants used "false, deceitful, and deceptive" images to recruit supporters to Bunkerville to interfere with BLM's impoundment operation. The government's opening statement reinforced this, promising the jury that it would "hear how the messaging transformed from stealing cattle to now there's government snipers around us" and "BLM has got us surrounded" and that these statements were "false." Had the defendants been able to proffer a basis for genuinely believing that government snipers surrounded the Bundy Ranch, they potentially could have negated the government's scienter theory. Thus, the

defendants contend that the withheld evidence was crucial to defending their case.

### 1.   The Surveillance-Camera Evidence

Prior to trial, Ryan Bundy had submitted an affidavit in which he claimed to have seen a device with a telephoto lens on a tripod overlooking Bundy's house.  The government opposed the request for information about this device as a "fantastical fishing expedition."  On the fourth day of trial, witness testimony confirmed that the government had indeed set up a camera overlooking Bundy's property, and that the camera had a live feed to the BLM's command center.  The defendants assert that this camera contributed to their feeling of being surrounded and, hence, helped rebut the government's position that the defendants *deceitfully* claimed that they feared for their lives because of government snipers.

Two specific pieces of evidence about the camera were withheld.  Both of these documents were prepared in 2014, and both confirm the existence of the surveillance camera set up to monitor the Bundy Ranch.  The first document is the Egbert 302 prepared in April 2014.  The Egbert 302 recounts that on April 6, 2014, Egbert went to investigate issues with the camera after its live feed had been lost.  The government produced the Egbert 302 a week into trial, apparently in response to a defense request for any video recordings from the surveillance camera.  Upon reviewing the 302 at the November 8 hearing, the district court agreed with the defense that evidence related to the camera was material.  The court ordered the government to turn over any evidence related to the camera.  Following this order, the government provided a second document, the "Law Enforcement Operations Order," on November 17, 2017.  That document

was prepared in March 2014, in advance of the impound operation. The document records that an Internet camera was to be set up "with a view of the Bundy residence."

The district court concluded that the documents were *Brady* material because the camera's "location" and "proximity to the home" showed that "its intended purpose was to surveil the Bundy home," which "potentially rebuts the allegations of defendants' deceit" in stating that they felt surrounded by snipers. The court found that the disclosure was untimely and the failure to disclose was prejudicial. The court also concluded that the government had been misleading in its earlier representations that the camera was not meant to surveil the Bundy home. Given that the Law Enforcement Operations Order specifically stated that the camera was to be placed "with [a] view of Bundy residence," the district court agreed with the defendants that "this information potentially rebuts the allegations of the defendants' deceit . . . about being surrounded, about the BLM pointing guns at them, and using snipers."

The government assails the district court's conclusion by arguing that a lone surveillance camera is unremarkable and proves nothing. As such, it claims that the withholding of these two pieces of evidence created no appreciable prejudice to the defense. But the government misses the point. This evidence undermined the government's theory that the defendants *intentionally lied* about fearing government snipers surrounding the property. The government could have argued the significance of the evidence to the jury, but it is hard to see how the government could argue that the evidence was irrelevant, much less a "fantastical fishing expedition."

Whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here. Because no verdict was rendered, the usual "retrospective test, evaluating the strength of the evidence after trial has concluded" is not applicable here. *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013). "[T]he retrospective definition of materiality is appropriate only in the context of appellate review"; thus, "trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial." *Id.* n.3; *see United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("[T]he government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed . . . as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence . . . might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed."). Since the new evidence emerged mid-trial, neither the district court (in the first instance) nor we (as a reviewing court) can measure prejudice against all the evidence produced during the trial. Rather, the district court had to assess the relative value of the Egbert 302 and the Law Enforcement Operations Order on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point.

In that light, there can be no question but that this was *Brady* material and that it should have been disclosed to the defense well in advance of the start of trial. This evidence was obviously favorable to the defense—it could have helped show that the defendants had a basis for feeling that their property was surrounded by snipers surveilling the home.

The government also argues that even if it should have disclosed the fact of the camera, the defendants could not have suffered prejudice because they knew about the camera. While the defendants may have known about the camera's existence—that is confirmed in Ryan Bundy's affidavit—they had no specific information about the camera. They did not know what kind of equipment the government was using, its sophistication, and its purpose. And it was not until the documents were released that it became evident that the camera was deliberately placed so it would have a view of the Bundy home—contradicting the government's representation that it was only placed "to cover the roads" near the Bundy Ranch. Thus, the district court's finding that the defense was prejudiced because it would have developed a stronger case if this evidence had been timely provided is not clearly erroneous.

### 2. FBI 302s Regarding Snipers

Several FBI 302s showing that heavily armed officers were present around the Bundy property were produced after the start of the trial. Two merit attention here.[3]

The first was the Delmolino 302, drafted in March 2015, and describing the activities of Agent Delmolino. The Delmolino 302 recounts that Agent Delmolino held a position "east of the Bundy Ranch" and at the time "was dressed in

---

[3] A third 302 was also withheld. This 302 was drafted in April 2014, following an interview with Curtis Racker, a field staff agent. Racker had been assigned a listening and observation post near the Bundy Ranch on April 4, 2014. The Racker 302 was provided on December 15, 2017. The parties hardly discuss this 302 in their briefing. Thus, we will not pass on this 302.

BLM tactical clothing and carried a BLM AR-15 rifle." This 302 was not provided to the defense until November 2017, after trial began. The government claims that withholding the Delmolino 302 was inadvertent.[4] In the district court, the government represented that it considered the 302 relevant only after the court determined that information regarding surveillance devices was relevant. Delmolino used a "seismic sensor," which the government believed the defendants could argue was a surveillance device.

The district court concluded that the Delmolino 302 was helpful *Brady* material, the withholding of which caused prejudice. Given that the Delmolino 302 shows that Agent Delmolino was positioned, armed, and wearing tactical gear near the Bundy property, it weakened the government's position that the defendants had no basis for fearing that they were surrounded by government snipers and, hence, deliberately spread misinformation to recruit armed followers. And before the Delmolino 302's release, the defense would have had no information about Agent Delmolino being positioned near the Bundy Ranch. Thus, we conclude that the district court did not clearly err in finding prejudice related to this 302.

The second 302 improperly withheld from the defense recounted the observations of a National Park Service official, Ernesto Felix (the Felix 302). This 302 was drafted in January 2015, but was not produced until December 5, 2017—well after trial began. According to the government,

---

[4] The government had previously provided 302s regarding other responsibilities of Agent Delmolino during the impound operation. However, these documents do not recount Agent Delmolino's being posted near the Bundy Ranch in tactical gear.

the Felix 302 was found only after Payne had made a mid-trial discovery request for information about specific agents. The 302 describes Felix's recollection of the arrest of Dave Bundy on April 6, 2014. It states that Felix "observed a BLM Agent on the high ground in a 'tactical over watch position,' southwest of where Dave's arrest occurred." The date of Dave Bundy's arrest is significant, because it was only after his arrest that the Bundys sent out a call for help, claiming that there were government snipers surrounding them.

The district court concluded that the Felix 302 was *Brady* material, the withholding of which prejudiced the defense. The government assails the prejudice finding by saying that the Felix 302 contains duplicative information. It claims that the defendants already possessed an email that referred to agents who took an "overwatch" position during Dave Bundy's arrest. But the government's argument misses why these documents were useful. The defendants claim that the Bundys feared they were *surrounded* by heavily armed snipers. Keeping the defense from gathering as much evidence as possible to show that there was a reasonable basis to fear that snipers surrounded the property was itself harmful.

Moreover, the Felix 302 actually refers to the BLM agent in the overwatch position as a "sniper." Indeed, the Felix 302 uses both "tactical over watch position" and "sniper" to refer to the same agent. This was tangible documentation showing that the government's own officials understood agents in overwatch positions to be equivalent to "snipers." Even if the defendants had some other evidence of agents taking "overwatch" positions around the Bundy property, the Felix 302 supported their theory in ways that the provided emails did not. The Felix 302, therefore, adds credibility to the

Bundys' claims that they feared the presence of "snipers" and it should have been disclosed prior to trial.

In sum, like the evidence regarding the camera, these documents could have helped the defense show that the defendants genuinely feared the presence of snipers—contradicting the allegations that the defendants intentionally lied about being surrounded by snipers to inflame supporters. Given the importance of these documents, the district court did not clearly err in finding that their withholding constituted a *Brady* violation that prejudiced the defendants.

### 3.  The TOC Log

Another piece of exculpatory evidence speaking to both the presence of snipers and the surveillance camera is the TOC Log.  The log records the operations and actions of members of the SWAT team at the FOB.  In one entry, the log records: "Snipers inserted."  The log also records observations from the camera's live feed.

The government did not produce the log until November 17, 2017—well after trial was underway.  The government had taken the position that there were no "snipers," and that agents in the "overwatch" position were simply "law enforcement officers."  Indeed, in the Tier 3 trial conducted some nine months earlier, the government had represented that no "snipers" were involved in the operation. Based on this representation, the district court had entered an order precluding testimony referencing snipers.  The court even removed a testifying defendant from the stand because he made several references to snipers.  Given the value of the TOC Log and its black-and-white reference to "snipers," the district court concluded that it constituted *Brady* evidence and

that its withholding prejudiced the defense. There can be no question that the withholding of a government document recording "snipers inserted" caused prejudice.

### 4. The Threat Assessments

The defendants also contend that several withheld threat assessments were exculpatory and that their absence caused prejudice. The government had timely provided one threat assessment, prepared in 2014 in anticipation of the March-April 2014 impoundment. That assessment concluded there was a moderate risk of violence from Bundy if the impound operation were undertaken. But the government withheld four additional threat assessments, all prepared in 2011 or 2012, some of which concluded that Bundy posed a lesser risk of violence. The defendants had asked for all threat assessments "in this case." That phrase was ambiguous, and the government might reasonably have believed that it complied with defendants' request when it provided the threat assessment prepared for this action. But, at the very least, the prior assessments became relevant when the government told the jury in its opening statement that BLM had weighed whether to impound Bundy's cattle in 2012 and decided not to proceed "because of concern for the violence" and when a witness testified on November 16, 2017 that there had been earlier threat assessments.

The first withheld threat assessment was a March 2011 FBI threat assessment of Bundy, created in anticipation of an impound operation. The assessment concluded that Bundy represented a "low to moderate risk of significant or imminent violence." The assessment noted, *inter alia*, how Bundy had no criminal record, was attached to his family, and

appeared to prefer using non-violent means of channeling his frustration, such as litigation and media appearances.

The second assessment was generated a year later by the Southern Nevada Counterterrorism Center. This assessment concluded that "[t]he likelihood of violence from Cliven Bundy is minimal." It specifically highlighted his age and lack of a criminal history as indicators that he was unlikely to act violently.

The third assessment was a Department of the Interior (DOI) assessment of Bundy and members of his family. It also concluded that there was moderate threat of violence. The DOI assessment compiled accounts from individuals who had interacted with Bundy or his family in the past, several of whom said that he was unlikely to act violently.

Finally, the DOI conducted another assessment in anticipation of enforcement operations. This assessment concluded that the risk of violence was "moderate." It recommended that BLM develop a media strategy with "talking points" to keep ahead of negative publicity as a means of mitigating the potential risk of backlash. The district court specifically highlighted how BLM's failure to implement this recommended public-relations plan favored the defense because the government was not actively correcting disinformation from the Bundys.

These withheld threat assessments had significant exculpatory and impeachment value. The 2011 and 2012 threat assessments would have countered the government's opening statement. Beyond that, the earlier assessments were at least contrary to, though not necessarily inconsistent with, the 2014 assessment. The withheld threat assessments also

undermined the need for an aggressive, militarized impound operation because they suggest alternative ways of defusing emotions surrounding actions taken against the Bundys.

The government asserts that the withholding of the threat assessments was not prejudicial because the March 2014 assessment contained essentially the same information as the withheld assessments. It also points to testimony by government witnesses regarding how Bundy was viewed as a minimal threat. But it is apparent the documents themselves have value that testimony alone does not necessarily carry. The assessments are reasoned, written evaluations of the danger posed by the Bundys. They were more than the bottom-line assessments offered by witness testimony. Further, even if some similar information had been produced earlier, the *repeated* description of Bundy as a low-to-moderate threat in several assessments is itself important to the defense and could have at least been readily deployed as impeachment evidence to any testimony regarding why a militarized impound was necessary. The withheld threat assessments also contain information that the March 2014 assessment does not include—a notable example being the DOI assessment's summary of encounters with Bundy. Thus, the district court did not clearly err in concluding that the defendants suffered prejudice by not receiving these documents.[5]

---

[5] The district court also concluded that several withheld maps constituted *Brady* material, were willfully withheld, and created prejudice. But the maps' withholding does not appear to have had prejudicial impact. The government had previously disclosed several maps showing the same information.

The defense also asserts that the government wrongfully withheld an internal whistle-blower memorandum regarding possible bias by BLM

\* \* \*

Surveying all of the withheld evidence, we agree with the district court that the defendants suffered not only prejudice, but substantial prejudice.  The district court concluded that the defendants specifically suffered prejudice in not being able to prepare their case fully, refine their voir dire strategy, and make stronger opening statements.  The record amply supports this conclusion.

B. *Whether the Government Engaged in Flagrant Misconduct*

In this section, we first review the standard for judging "flagrant misconduct" and then consider the circumstances under which the government withheld *Brady* material in this case.

1.  Flagrant Misconduct

Substantial prejudice alone does not entitle defendants to have their indictments dismissed with prejudice.  Nor is it sufficient that the government committed multiple *Brady* violations.  To warrant dismissal of an indictment with prejudice, the government must have engaged in flagrant misconduct in withholding the evidence.  *Kearns*, 5 F.3d at 1253.

---

Agent Dan Love, who oversaw the impoundment.  The memorandum appears helpful to the defense.  However, because the district court did not make any determinations regarding this memorandum, we will not address it.

The government candidly admitted at oral argument that "in light of the district court's findings of materiality, what is clear is that we fell short." But it forcefully contends that it was not guilty of flagrant misbehavior because it did not willfully withhold exculpatory evidence from the defense. The government points out that many of the documents at issue were in the hands of other federal agencies, such as the FBI, and not the prosecution team. For that reason, the government decries the possibility of turning the flagrant-misconduct requirement into a strict-liability standard where any *Brady* violation caused by the actions of another government agency can lead to dismissal of an indictment. Indeed, the district court itself believed that the nondisclosures were the fault of "other government agencies; not in the U.S. Attorney's Office." We are sensitive to the government's concern and agree that dismissal of an indictment is not an appropriate remedy for an ordinary *Brady* violation. *See id.* But both the factual record and the law belie the government's concerns here.

As a matter of law, the prosecution is "deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989). The government's attempts to absolve itself of wrongdoing for other agencies' failures therefore fall flat. To the extent that any government agencies or actors, through their own flagrant misconduct, failed to make known exculpatory information, the flagrant nature of such conduct will be imputed to the prosecution—just as the agencies' or actors' *Brady* violations are imputed to the prosecution. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (per curiam) (holding that a *Brady* violation occurs "when the government fails to turn over even

evidence that is 'known only to police investigators and not to the prosecutor'"); *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (explaining that prosecutors are responsible for turning over "information known to other agents of the government" of which the prosecutor did "not know but could have learned" (citation omitted)), *petition for rehearing en banc docketed*, No. 17-50151 (9th Cir. Jan. 2, 2020).

Further, the government is wrong to suggest that flagrant misconduct must be intentional or malicious.  Although flagrant misconduct cannot be an "accidental or merely negligent" failure to disclose, the misconduct need not be intentional.  *Chapman*, 524 F.3d at 1085.  "[R]eckless disregard for the prosecution's constitutional obligations" is sufficient to give rise to flagrant misconduct.  *Id.*

### 2.  The Withholding of *Brady* Material

a.  *The Surveillance Camera.*  The district court permissibly found that withholding of information about the surveillance camera was willful rather than merely inadvertent.  Recall that Ryan Bundy requested information regarding the camera in August of 2017.  The government opposed the request, saying that Ryan Bundy was engaging in "little more than a fantastical fishing expedition for evidence justifying attacking law enforcement."  The district court initially denied the request because the request did not comply with the local rules and failed to include supporting arguments for why the evidence requested was discoverable. But the district court later noted that the government had acted with "some coyness" in turning over evidence.

The government made no effort to locate the documents regarding the camera and turn them over before the discovery deadline in October 2017. The prosecution has an affirmative obligation to learn of potentially favorable evidence and provide it to the defense. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (explaining that a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); *Cano*, 934 F.3d at 1023 (stating that prosecutors are responsible for "information held by subordinates such as investigating police officers and [the duty to inquire] sometimes extends to information held by other executive branch agencies" (citations omitted)). Rather than looking into the request and locating the documents before trial began, the government chose to fight rather than respond to the request. This was a deliberate choice and the district court did not err in concluding otherwise.

In an effort to absolve itself of responsibility, the government points out that the district court originally ruled that Ryan Bundy's requests for information regarding surveillance cameras were inadequately supported and appeared to request immaterial evidence. But the district court's order cannot innoculate the government here. Ryan Bundy requested specific information about the surveillance camera, namely its make, model, and characteristics; the district court failed to see why that information was material. Contrary to the government's insinuation, however, the district court never suggested that information regarding the existence and purpose of the camera was immaterial. And once the district court was presented with all of the information about the camera—particularly that it was set up

with a view of the Bundy home,[6] the district court had no difficulty determining that the evidence was material and should have been provided to the defense under *Brady*. Over the course of the hearings, the district court found the information "favorable to the accused and potentially exculpatory," and criticized the government for withholding it on the "implausible claim" that no one viewed anything reported from the camera.

The fact remains that the government, at least the FBI, had this information in its possession. The district court, when it made its initial ruling, did not. A court does not have the same degree of familiarity or access to the evidence that a prosecutor has. Hence, it is prosecutors, not courts, that are "presumed to recognize [the] significance" of evidence. *United States v. Agurs*, 427 U.S. 97, 110 (1976). In short, prosecutors cannot hide behind a court's discovery order to suppress exculpatory evidence. We therefore decline to offer blanket protection against findings of flagrant misconduct simply because the court initially failed to see why a certain aspect of evidence was material when the defense failed to show materiality. Granting such protection could well

---

[6] At one point in the discussion of the camera, the government stated that the camera "was placed on high ground above the Bundy residence," but added, "I don't want to leave the Court with the impression that it was fixed on the Bundy residence." However, the Law Enforcement Operations Order—the master plan for the impoundment—called for "Surveillance Systems," and specified that it would be an "Internet camera with [a] view of [the] Bundy residence."

encourage prosecutors to seek favorable discovery rulings to use later as weapons against *Brady* claims.[7]

The materiality of evidence regarding a surveillance camera pointed at a home to a case where the family claimed that they felt surrounded by government snipers should have been self-evident. Ryan Bundy had stated that he thought the device had a "visible laser." There is no evidence that it did. The government's evidence would have confirmed the existence of a device but dispelled speculation about use of a laser. Providing the information would have clarified the situation for both sides, allowing each to muster the best facts in support of its argument. Whether the withholding of the document was the fault of the FBI or the prosecution team, someone decided to withhold it. With or without a request from the defense, the government should have handed this information over—not fought its release. *See Strickler*, 527 U.S. at 280 ("[T]he duty to disclose [favorable] evidence is applicable even though there has been no request by the accused . . . .").

b. *Evidence of Snipers.* Of particular concern is the government's handling of evidence related to the presence of snipers. This was a hot-button issue. The term is evocative, rhetorically charged, and would have been a dog whistle for

---

[7] We also note that the materiality of evidence under *Brady* is an objective inquiry. *See United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also* Fed. R. Crim. P. 16(a)(1)(E)(i). Once the district court had a full view of the evidence here, it properly concluded that the documents related to the camera were material—a conclusion that the government should have reached on its own. As such, a district court's failure to appreciate the importance of exculpatory evidence does not relieve the prosecution of its obligation to turn over material evidence.

summoning members of private militias in ways that screaming "surveillance cameras!" would not. The government said the Bundys' claim of "snipers" was "false" and "deceitful," yet the government's own documents referred to its agents as "snipers." The government disputed the relevance of this information, fixating on the question of whether the officers in the "overwatch" were technically "snipers." The district court had to remind the government that these were questions for the jury.

The failure to produce evidence regarding "snipers" was particularly troubling for the district court because, during the Tier 3 trial of other co-defendants, the district court prohibited testimony regarding the presence of snipers, based on the government's assurances that there were no snipers involved in the impound operation. The district court even removed a testifying defendant from the stand in that trial because the defendant kept stating that snipers were present. The district court was understandably exasperated when evidence came to light in this trial, showing that the government referred to its agents as "snipers."

In short, the government had to know the import that any evidence regarding snipers, or agents who looked and functioned like snipers, would have in this case. Nevertheless, it withheld a slate of information bolstering the claim that the defendants could have had a reasonable basis for believing there were snipers in the area. The government claims that it relied on the district court's motion-in-limine order in believing that much of the evidence at issue here was irrelevant. Even assuming that the government could have understood the district court's motion-in-limine order to preclude the usefulness of evidence supporting an affirmative claim of self defense, the evidence was still quite obviously

*Brady* material.**8**  Specifically, the evidence speaking to the presence of snipers undermined the government's scienter theory—that the defendants recruited armed supporters by lying to them about snipers surrounding the Bundy Ranch. The defendants were entitled to any evidence that could contradict this theory, irrespective of whether they could or would muster an affirmative defense.  Espousing the belief that evidence undercutting the government's central theory of mens rea was somehow irrelevant and not *Brady* material was preposterous and reckless.

As for the Delmolino and Felix 302s, the government once again points out that this information was in the hands of the FBI.  The district court concluded, irrespective of the agency responsible, that the government's withholding the Delmolino 302 was willful.  It noted how the prosecution team had direct knowledge that Agent Delmolino had been stationed near the Bundy home in tactical gear.  While the Delmolino 302 itself was in the hands of the FBI, the district court specifically noted that members of the trial team from

---

**8** The motion-in-limine order left open the possibility that the defendants could make an offer of proof regarding self-defense.  Thus, far from closing the door on information helpful to an affirmative defense, the order highlighted that the evidence could have been useful, and hence should have been handed over.  As the district court pointed out, this language should have "placed the Government on notice that evidence that could bolster a theory of self-defense might become relevant at trial."  Indeed, by not providing evidence about the affirmative defense, the government basically foreclosed opportunities for the defendants to make an offer of proof.  Furthermore, *Brady* evidence does not necessarily have to be admissible.  *See United States v. Price*, 566 F.3d 900, 911–12 (9th Cir. 2009).  Even assuming that the evidence here had no value in challenging the government's theory of mens rea, it still would have had impeachment value and potentially could have led to other evidence supporting a self-defense claim.

the U.S. Attorney's Office were present at the interview with Agent Delmolino in March 2015. Yet, the information about Agent Delmolino's posting near the Bundy Ranch was not revealed until the Delmolino 302 was released in November of 2017, after trial began. Likewise, members of the prosecution team were present for the interview of Felix in 2015. Hence, the prosecution team was not entirely ignorant of the information provided by Delmolino and Felix in the 302s—even if it turns out that the blame for not turning over these 302s lies with the FBI.

Because the prosecution team had direct knowledge of some of this information, its claim that the court imposed "strict liability" for the FBI's failure to hand over the 302s falls flat. Regardless, the argument is of no moment because the FBI's decisions not to provide the information are imputed to the prosecution. *See Youngblood*, 547 U.S. at 869–70; *Bryan*, 868 F.2d at 1036. And the government has not explained how simple inadvertence or oversight within the FBI kept the agency from producing these documents.

c.  *The Threat Assessments.* Likewise, with the threat assessments, the government failed to turn over beneficial information speaking to Bundy's potential for violence. These documents could have helped bolster the defense's claim that the government had engaged in an overmilitarized impound operation that the Bundys claim fueled their fears of being surrounded by snipers. But irrespective of the theory defendants were to put forward, these documents should have been released. They, at the very least, provided impeachment evidence because some of their findings contrasted with the 2014 threat assessment used as the basis for planning the impound operation, and they undermined the prosecution's opening statement.

Moreover, these documents were in the prosecution's possession all along.  Notably absent from the government's brief is any discussion of how or why these documents were overlooked.  All the government says is that it relied on the district court's motion-in-limine order, believing that the information in the threat assessments was not relevant.  However, the independent impeachment value of these documents should have been obvious, given that certain documents contained information about Bundy presenting a minimal threat.  And to the extent that the prosecution doubted "the usefulness of evidence," the government "should resolve such doubts in favor of full disclosure." *United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1984).

Someone in the government made a conscious choice to withhold these documents.  It may not have been a malicious choice, but it also was not a matter of simple oversight.  At best, the government failed to appreciate the relevance of the evidence.  At worst, it sought to handicap the defendants by withholding evidence directly relevant to mens rea.  In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win.  *See Chapman*, 524 F.3d at 1088 (affirming dismissal of an indictment with prejudice because the prosecutor did not abide by his "'sworn duty . . . to assure that the defendant has a fair and impartial trial,' and his 'interest in a particular case is not necessarily to win, but to do justice'" (alteration in original) (quoting *N. Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001))).  Thus, the district court had grounds for concluding that the government's failure to produce this evidence rose to the level of reckless disregard and, hence, flagrant misconduct.

*d. The TOC Log.*  The TOC Log presents a different circumstance.  The district court found that the failure to turn it over was willful on the government's part.  We conclude that the district court clearly erred here.

Unlike the 302s, which were created as part of an ongoing investigation and prosecution, the TOC Log was simply forgotten about following the impound operation.  According to the government, because the "FBI never activated its SWAT teams" during the impound operation, the TOC Log "was never added to the investigative file or to FBI's 'police assist' file, but instead remained on a thumb drive in the TOC trailer."  Specifically, the log's thumb drive was left hanging "in the TOC truck next to the computer on a designated hook" and not placed in an investigation file or database.  It was located only after an FBI agent tried to gather any remaining evidence related to the camera following the November 8 hearing.

The district court concluded that the failure to turn over the TOC Log was willful suppression.  Although we agree that failing to turn over the TOC Log was a *Brady* violation, we do not agree that the failure to produce the TOC Log amounted to flagrant misconduct.  We have been careful to note that negligence or inadvertence cannot form the basis for flagrant misconduct.  *Chapman*, 524 F.3d at 1085; *Kearns*, 5 F.3d at 1255.

We cannot see how the failure to turn over the TOC Log resulted from anything other than negligence.  The Log was left in the TOC vehicle pursuant to protocol.  Given the unique circumstances of how the Bundy impound operation and subsequent investigation played out, the TOC Log was not added to the FBI's investigation file.  Only after

significant efforts, directed to locating other evidence, was it located. Thus, even though the TOC Log's withholding was a significant *Brady* violation, we see no ground for concluding that its absence was the result of reckless disregard.

\* \* \*

Although we see only negligence in the withholding of the TOC Log, we can find no clear error in the district court's conclusion that the withholding of the camera evidence, the Delmolino and Felix 302s, and the threat assessments crossed the threshold from negligence to recklessness. The prosecution withheld facially exculpatory evidence that directly negated the government's theory that the defendants lied about fearing snipers. The deliberate choices to withhold these documents were not cases of simple misjudgment, especially given that doubt about the helpfulness of evidence should be resolved in favor of disclosure. *Van Brandy*, 726 F.2d at 552.

In the end, the clearly erroneous standard recognizes that the district court is closest to the case, the parties, and the record. The district court was quite familiar with the case. It had supervised the case from its inception. The court had already conducted a trial and retrial for the Tier 3 defendants. It is not surprising that the district court registered its frustration with the government's intransigence in turning over discovery. At the November 13 hearing, it expressed dismay "with these late disclosures and representations made by the government that things did not exist but ultimately were found to exist." At the November 29 hearing, it commented on the "dribs and drabs" being released weeks after the trial began, and well after the date scheduled for

production of the material.  The district court was best positioned to decide whether the government acted with flagrant misbehavior that prejudiced the defendants.[9]  Given the evidence that the government acted with at least reckless disregard for the *Brady* value of some evidence that prejudiced the defense's ability to marshal their case, we conclude that the district court's findings of substantial prejudice and flagrant misconduct in relevant part were not clear error.

## C.  *Whether Dismissal of the Indictment with Prejudice Was Justified*

A district court may dismiss an indictment as "an appropriate sanction for a constitutional violation only where less drastic alternatives are not available."  *Kearns*, 5 F.3d at 1254.  As we previously discussed, even when a district court finds substantial *Brady* violations, prejudice to the defendants, and flagrant government misconduct, a district court has a range of options before it.  Dismissal with prejudice is, short of disciplining attorneys personally, "the most severe sanction possible" for a court to order, because it ends the government's case.  *Isgro*, 974 F.2d at 1097.  Despite the severity of that sanction, the fact remains that

---

[9] Although we affirm the district court's finding of flagrant misconduct for the purposes of dismissing an indictment, we do not intend to cast aspersion on the professionalism of the members of the U.S. Attorney's Office here.  This was obviously a difficult and trying case for everyone involved and, while we find a serious constitutional violation based on choices made by the government, we in no way imply that the misjudgments made here rise to the level of professional misconduct. Indeed, much of the "blame" from the constitutional violations here falls on the prosecution only because actions and knowledge related to evidence by other government agencies are imputed to the prosecution.

"[t]he district court is in the best position to evaluate the strength of the prosecution's case and to gauge the prejudicial effect of a retrial." *Chapman*, 524 F.3d at 1087. It is for this reason that we review the district court's choice of remedy "for abuse of discretion, a standard of review that is 'limited and deferential.'" *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013). Although we have said that dismissal with prejudice requires a district court to find that "no lesser remedial action is available," *Chapman*, 524 F.3d at 1087 (citation omitted), we recognize that, in theory, a lesser remedy will always be available. We understand by this phrase that a district court must conclude that no lesser remedy will fully address the damage caused by the government's misconduct. We do not have to find that dismissal with prejudice is the only remedy the district court could have chosen, because to conclude so would mean that it would have been an abuse of discretion for the district court to have made any other decision.

What the phrase "no lesser remedial action is available" means is that any lesser sanction will put the defense at a greater disadvantage than it would have faced had the government produced the *Brady* material in the first place—thereby perpetuating the harm from a violation of a federal constitutional right. *See Struckman*, 611 F.3d at 577–78. In *Chapman*, we explained that in that case, "the mistrial remedy would advantage the government, probably allowing it to salvage what the district court viewed as a poorly conducted prosecution." *Chapman*, 524 F.3d at 1087. We concluded that the government should not be permitted "a chance to try out its case, identify any problem areas, and then correct those problems in a retrial." *Id.* (citation and alterations omitted); *see United States v. Shafer*, 987 F.2d 1054, 1059 (4th Cir. 1993) ("[The government's] self-

inflicted injury cannot be used to afford the government a second chance to prosecute so that it may argue a recast theory of the case better supported by the evidence.").

Notwithstanding the government's earnest efforts, we can find no grounds for concluding that the district court abused its discretion in dismissing this indictment with prejudice. The government claims that the district court's findings are unsupported, arguing that the court gave only cursory consideration to the actual prejudice suffered by the defendants as a result of the government's *Brady* violations. The record, however, satisfies us that the district court thoroughly considered the prejudicial effects.

The district court held several hearings on the various *Brady* violations, complete with rounds of briefing and oral arguments. Several times, the district court highlighted its concerns to the government. The district court also gave the government ample opportunity to brief and argue whether the prejudice suffered was substantial. The district court recited the proper legal standards and made the appropriate findings.

The district court specifically concluded that retrial here was inappropriate. It found that retrying the case "would only advantage the government by allowing them to strengthen their witnesses' testimony based on the knowledge gained from the information provided by the defense and revealed thus far." The district court explained that the government could "perfect its opening statements based on the revealed defense strategy in its opening and . . . conduct more strategic voir dire at the retrial."

The district court did not abuse its discretion in concluding as much. Lesser sanctions—such as a

continuance to allow the defendants to review discovery or declaring a mistrial and starting over—would have given the government an opportunity to strengthen its case at the defendants' expense.  Other remedies such as recalling witnesses or granting a continuance would not cure the prejudice already suffered by the defense in the form of lost voir-dire and opening-statement opportunities.  Moreover, once the government turned over the *Brady* material, it may have realized it might be difficult to pursue the case it had promised in the indictment and the opening statement:  that the defendants had lied about the snipers and being surrounded.  Accordingly, not only would the *Brady* documents affect the *defendants'* strategy, it might well have altered the *prosecution's* strategy.  Having "tr[ied] out its case" and "identif[ied] . . . problem area[s]," the government could have "correct[ed] those problems in a retrial." *Chapman*, 524 F.3d at 1087 (fourth alteration in original).

The government responds that even if dismissal were warranted, the district court could have struck the portions of the indictment alleging that the defendants intentionally lied about feeling surrounded by snipers, and not dismissed the entire indictment with prejudice.  The paragraphs in question, however, are not counts, but factual allegations supporting the government's charges.  It is unclear to us whether striking these sections would have served the remedial purposes of the court's exercise of its supervisory power.  These do not appear to be elements of the crimes alleged, but were a theory of the government's case, as elaborated in its opening statement.  The government's case, therefore, would have been significantly altered without these allegations, but perhaps not weakened.  And that would have meant that the government would get a second shot at preparing its case, "allowing [the government] to salvage" the case.  *Chapman*,

524 F.3d at 1087. The district court did not abuse its discretion in failing to choose partial dismissal as a remedy.

There is also the related need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct as occurred here. We note the government's failure to acknowledge and confess any wrongdoing during the course of this case—especially as to material misrepresentations to the district court about the presence of snipers. Rather than accepting responsibility, the government blamed the defense for not requesting more specific information. Even in its motion for reconsideration, the government continued to maintain that it never had an obligation to turn these documents over and that any omission on the government's part was the fault of the defendants for not doing a better job of showing why this information was relevant. Only on appeal has the government admitted that it should have turned these documents over.

In *Chapman*, we specifically highlighted the prosecutor's "unwillingness to take responsibility for his conduct," finding that this supported the district court's decision to dismiss an indictment with prejudice. 524 F.3d at 1088; *see also id.* ("We are similarly troubled, both by the AUSA's actions at trial and by the government's lack of contrition on appeal."). Likewise, "attempt[s] to minimize the extent of the prosecutorial misconduct, completely disregarding the AUSA's repeated misrepresentations to the court and the failure to obtain and prepare many of the critical documents until *after* the trial was underway" are themselves added grounds for dismissing an indictment with prejudice. *Id.* Given the government's efforts to minimize the defendants' discovery requests and its misrepresentations to the district court in such a high-profile case, the district court

understandably sought a remedy that would reinforce the
seriousness of the violations here.

Finally, we note that other courts have recognized the
great prejudice suffered when a defendant is denied access to
evidence challenging the government's central theory of the
case until mid-trial. In *United States v. Shafer*, for example,
the government lost evidence that significantly undermined
the testimony of key witnesses. 987 F.2d at 1056. The
defendant moved to dismiss the case with prejudice. *Id.* The
district court, however, only declared a mistrial and declined
to dismiss with prejudice, giving the government another
chance to prosecute the case. *Id.* The Fourth Circuit
concluded that the district court abused its discretion in
giving the government the opportunity to retry the case. *Id.*
at 1058. The court reiterated the seriousness of federal
felonies and how the government had ample time to prepare
the case. *Id.* at 1059. It then concluded that "[t]he proper
course of action was for the district court to dismiss the case
with prejudice." *Id.* It closed by saying that there is no
"manifest necessity" to try a case tainted by "the mid-trial
'discovery' of substantial exculpatory evidence contradicting
the government's theory of the case." *Id.* Here, the district
court concluded that the government should not benefit from
its misconduct. And there can be no denying that the
government would enjoy the benefit of having done a "dry
run" of this case. Because the district court could find no
other way to avoid giving the government this benefit, it did
not abuse its discretion in dismissing the indictment.

We do not need to go so far as to affirm that each of us
would also have dismissed the case with prejudice. It is the
nature of discretion and a consequence of the vicissitudes of

life that district courts have leeway to fashion an appropriate remedy. As Justice Frankfurter explained for the Court:

> The civilized conduct of criminal trials cannot be confined within mechanical rules. It necessarily demands the authority of limited direction entrusted to the judge presiding in federal trials, including a well-established range of judicial discretion, subject to appropriate review on appeal . . . . Such a system as ours must, within the limits here indicated, rely on the learning, good sense, fairness and courage of federal trial judges.

*Nardone v. United States*, 308 U.S. 338, 342 (1939). It is sufficient for us to conclude that the district court did not abuse the discretion entrusted to it, that dismissal with prejudice was within the range of appropriate remedies in this case.

## IV. CONCLUSION

The district court can dismiss an indictment under its supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *Struckman*, 611 F.3d at 574 (internal quotation marks omitted). These prerequisites are met here.

The judgment is **AFFIRMED**.[10]

---

[10] Ryan Payne's motion to unseal Volume IX of the government's excerpts of record is denied.  The government's motion to maintain under seal Volumes 18 to 22 of the excerpts of record submitted by Ryan Payne and Ammon Bundy is granted but the request to strike those same volumes is denied.  The government's motion to maintain under seal Volume 23 of the excerpts of record submitted by Ryan Payne and Ammon Bundy is denied and the request to strike that same volume is denied.